IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| SHAWNDOE K. PROCTOR, | ) | Case No. 1:17-cv-2663 |
| | ) | |
| Plaintiff, | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT & RECOMMENDATION** |
| Defendant. | ) | |

**I.    Introduction**

Plaintiff, Shawndoe K. Proctor ("Proctor"), seeks judicial review of the final decision of the Commissioner of Social Security denying his applications for supplemental security income and disability insurance benefits under Titles II and XVI of the Social Security Act ("Act").  This matter is before the court pursuant to 42 U.S.C. §405(g), 42 U.S.C. §1383(c)(3) and Local Rule 72.2(b).  Because the ALJ failed to apply the correct legal standards, I recommend that the final decision of the Commissioner be VACATED and the matter be REMANDED for further proceedings.

## II.       Procedural History

Proctor applied for disability insurance on March 27, 2015 and for supplemental security income on August 5, 2015.  (Tr. 260, 267)  He alleged a disability onset date of December 10, 2013.  (Tr. 267)  His application was denied initially (Tr. 184, 193) and after reconsideration. (Tr. 203, 210)  Proctor requested an administrative hearing (Tr. 215), and Administrative Law Judge ("ALJ") Joseph Hajjar heard the case on March 8, 2017 (Tr. 41-77), and denied Proctor's claim in a March 27, 2017 decision.  (Tr. 11-30)  On November 22, 2017, the Appeals Council denied Proctor's request for review, rendering the ALJ's conclusion the final decision of the Commissioner.  (Tr. 1-3)  On December 20, 2017 Proctor filed this case.  ECF Doc. 1.

## III.      Evidence

### A.       Personal, Educational and Vocational Evidence

Shawndoe Proctor was born on April 8, 1976 and was 37 years old on the alleged onset date.  (Tr. 46, 28)  He completed the 11th grade of high school.  (Tr. 48)  He has prior work experience as a stock selector.  (Tr. 50)

### B.       Relevant Medical Evidence – Physical Limitations[1]

On May 8, 2013, Proctor went to the emergency room with chest pain, shortness of breath and leg swelling.  His blood pressure was 235/126 and he weighed 400 pounds.  (Tr. 878) He was admitted to the hospital.  A chest x-ray showed cardiomegaly with pulmonary congestion.  (Tr. 730)  He was diagnosed with chest pain and hypertension and was discharged on May 10, 2013.  (Tr. 876-891)  He was diagnosed with malignant hypertensive heart disease with heart failure, acute on chronic diastolic heart failure, morbid obesity, nonalcoholic

---

[1] The medical records also show that Proctor had mental impairments.  Because Proctor's appeal raises no issues related to his mental impairments, I have not summarized that evidence in this report.

steatohepatitis, tobacco abuse, dysmetabolic syndrome X, extremity cramps, and severe vitamin D deficiency.  (Tr. 890)

An x-ray of Proctor's lumbar spine on August 21, 2013 showed large anterior osteophyte from L3 to L5 and T11-T12.  (Tr. 753, 1593)

Proctor saw John Hill, M.D., for pain management on October 8, 2013.  (Tr. 748) Proctor complained of low back pain that radiated down both his legs to his ankles.  Examination showed that Proctor's sensation was intact; he had 2+ reflexes; 5/5 strength; and had negative straight leg raising tests.  He had pain with extension and rotation of the lumbar spine and flexion.  Dr. Hill assessed lumbar radiculitis, spondylosis.  He prescribed Percocet and recommended a series of lumbar epidural steroid injections.  (Tr. 749)

Proctor saw Dr. Hill again on October 22, 2013.  He reported back pain of 8-9/10.  He had one epidural steroid injection and was not sure if it helped.  He reported numbness and tingling in his right thigh.  (Tr. 747)  Proctor received epidural steroid injections at L3-L4 on October 28th and November 11th.  (Tr. 593, 595)

On December 5, 2013, Proctor sought treatment from John Lee, D.O.  He complained of knee and back pain with movement.  He reported he could sit for one hour before he needed to move around.  He also reported some anxiety and depression because of his weight.  (Tr. 448) Dr. Lee diagnosed nausea and morbid obesity.  (Tr. 448)

Proctor saw Nurse Practitioner Cynthia Campbell on December 12, 2013 for complaints of back pain.  Steroid injections helped minimally with his mobility, but he continued to have leg pain.  He was doing physical therapy and was getting minimal relief from it.  (Tr. 443)  He had mild back pain with straight leg raise test on the right, wide gait, and pain with range of motion in his lumbar spine.  (Tr. 445)

On January 8, 2014, Proctor told Ms. Campbell that he was having back pain and lumbar buttock pain, worse on the right since he fell on January 1st.  (Tr. 438-439)  Proctor had positive straight leg raise test on the right, wide gait, and pain with lumbar spine range of motion.  (Tr. 440)

An MRI on January 30, 2014 showed epidural lipomatosis, which completely effaced the cerebral spinal fluid form the thecal sac at multiple vertebral body levels.  It also revealed "possible arachnoiditis" with peripheral location of nerve roots and some clumping as demonstrated at L5-S1 level and multilevel discogenic and facet hypertrophic degenerative changes superimposed on a congenitally narrow canal.  It showed moderate to severe lateral recess stenosis at the L5-S1 level related to a disc herniation and a disc herniation at the L3-L4 level along with the prominent posterior epidural fat, which severely compressed the thecal sac with moderate canal stenosis.  (Tr. 320)

Proctor again saw Ms. Campbell on February 6, 2014.  He complained of pain in his back and left knee.  He had fallen on his left knee the week before his appointment and used crutches for several days.  (Tr. 433)  His weight was 465 pounds and his BMI was 59.88.  He was having tension headaches twice a week.  (Tr. 434)  He had positive straight leg raise test on the left, wide gait and the range of motion in his lumbar spine was limited due to pain.  Ms. Campbell diagnosed thoracic and lumbosacral neuritis or radiculitis; spinal stenosis in the lumbar region without neurogenic claudication; degeneration of lumbar or lumbosacral intervertebral disc; displacement of lumbar intervertebral disc without myelopathy; and lumbosacral spondylosis without myelopathy.  She prescribed Percocet.  (Tr. 435)

Proctor saw Todd B. Francis, M.D., on February 13, 2014.  Proctor complained of chronic lower back pain and bilateral leg numbness, right greater than the left, and worsening

4

over the prior two years.  Dr. Francis diagnosed morbid obesity, congenital narrow lumbar canal, mild to moderate stenosis at L3-L4.  Dr. Francis noted that Proctor's spinal stenosis caused neurogenic claudication as he walked.  He recommended bariatric surgery.  Surgical intervention for his spinal impairments was not an option due to Proctor's morbid obesity.  (Tr. 323-325)

Proctor saw Dr. Lee on February 14, 2014 for cough and chest congestion.  He also discussed back and knee pain, which was making it difficult for him to exercise and work.  He was looking into disability.  Proctor reported that he was often fatigued at nighttime.  Dr. Lee's assessment was elevated liver function tests, obesity, diabetes mellitus, hyperlipidemia, hypertension, herniated disc, congestive heart failure, gastroesophageal reflux disease ("GERD"), neuropathy, and neck mass.  (Tr. 428-430)

On March 4, 2014, Proctor saw Ashok V. Kondru, M.D. with complaints of persistent nausea and episodic vomiting over previous several months.  He was taking Omeprazole for reflux but continued to have heartburn and dyspepsia.  (Tr. 358)  Dr. Kondru noted that Proctor's "motor and sensory appear[ed] to be normal"; his reflexes were 2+ and symmetric; he had normal spine range of motion and his muscle strength was intact; he had a normal gait.  (Tr. 359)  Dr. Kondru diagnosed chronic reflux with nausea and vomiting with possible gastroparesis with reflux disease and possible candida esophagitis.  (Tr. 360)

Proctor saw Ms. Campbell on March 6, 2014.  He complained of back and knee pain. (Tr. 423)  Proctor's weight was 465 pounds and his BMI was 58.12.  He had positive straight leg raise test bilaterally, wide gait, and his lumbar spine range of motion was limited by pain.  (Tr. 425)  Ms. Campbell did not alter her assessment or treatment plan.  She continued to prescribe Percocet.  (Tr. 423-426)  Proctor had similar follow-up appointments with Ms. Campbell on April 2, 2014 and May 1, 2014.  (Tr. 413, 417)

On June 5, 2014, Proctor told Ms. Campbell that he needed additional pain medications and that he was having sleep disturbances.  Her assessment was unchanged.  She prescribed Gabapentin and Oxycodone.  (Tr. 407-409)

 On July 2, 2014, Proctor saw Ms. Campbell complaining of incontinence and frequent urination in addition to his complaints of back pain.  (Tr. 402)  He had negative straight leg raise tests.  His lumbar range of motion was limited by pain and his gait was wide.  Ms. Campbell's assessment was the same but she did not prescribe any medication because Proctor's drug screen was positive for cocaine.  (Tr. 404)

Proctor began treating with Paul Hanahan, M.D., for his chronic back pain on August 18, 2014.  Proctor complained of a burning sensation in his left foot and said that back pain kept him from walking any significant distance.  Dr. Hanahan assessed low back pain, right leg radiculopathy and diabetes of questionable control.  (Tr. 1002)  On September 15, 2014, Dr. Hanahan noted moderate tenderness in the lower midline, restricted range of motion and weaker leg lift on the right.  (Tr. 1001)

On October 9, 2014, Proctor saw Dr. Lee.  He reported that he had run out of his medication and had not taken it for several weeks.  He complained of shortness of breath.  Dr. Lee noted normal range of motion and a normal gait. (Tr. 398)  He assessed morbid obesity, diabetes, hyperlipidemia, hypertension, congestive heart failure, GERD, arthritis, thoracic or lumbosacral neuritis or radiculitis, Vitamin D deficiency, and shortness of breath.  (Tr. 398-399) Proctor saw Dr. Lee for follow-up appointments on October 22, 2014, October 29, 2014, December 16, 2014, December 23, 2014, and January 8, 2015.  Dr. Lee prescribed various medications for Proctor's conditions.  (Tr. 393, 392, 389, 390, 383)

On October 13, 2014, Proctor followed-up with Dr. Hanahan.  Proctor reported he was having difficulties with back pain and with daily activities because of tiredness; he was not sleeping well.  Dr. Hanahan diagnosed lumbar disc disease and sleep apnea.  He ordered a polysomnogram.  (Tr. 1000)  He met with Dr. Hanahan again on November 10, 2014.  His back was still painful.  Dr. Hanahan reviewed the January lumbar MRI.  (Tr. 999)

Proctor saw Dr. Hanahan on December 15, 2014.  The sleep study showed that Proctor had severe obstructive sleep apnea.  He was given a CPAP machine and discussed this with Dr. Hanahan.  His back status was relatively stable but he continued to have pain.  He was using a cane to walk.  (Tr. 997)  On January 15, 2015, Proctor reported improved sleep with use of the CPAP machine.  (Tr. 996)

Proctor was admitted to the hospital again on January 30, 2015.  (Tr. 514)  His primary diagnosis at discharge was diabetes mellitus with hyperglycemic hyperosmolar syndrome.  (Tr. 515)  His medication were listed as Topamax, Novolog, Levemir, Augmentin, diabetic supplies, Neurontin, Norvasc, Clonidine, and Lipitor.  (Tr. 515-516)  Proctor was discharged on February 5, 2015.  (Tr. 514)

While at the hospital, Proctor met with a physician's assistant in the neurology department to evaluate left thigh numbness, cramps and tremors lasting three days. (Tr. 509) The assessment was peripheral neuropathy and lumbar spinal stenosis and new onset tremors. Proctor felt that his tremors were improving so no medication was prescribed.  (Tr. 513)

Proctor saw Preetha Muthusamy, M.D., on February 3, 2015.  (Tr. 805-807) Examination showed that Proctor's sensory was decreased to cold and vibration in the lower extremities.  He had plantar withdrawal bilaterally and a wide gait.  (Tr. 806)  The assessment was tremors from diabetic crisis and back pain and bilateral leg pain and numbness secondary to

7

moderate to severe lumbar spinal stenosis with epidural lipomatosis, with degenerative changes. Dr. Muthusamy noted that there was evidence of arachnoiditis seen in the last MRI; that Proctor was not a candidate for epidural injections; that he failed physical therapy; and that he needed bariatric surgery before neurosurgery could be considered.  (Tr. 807)

Proctor met with Dr. Hanahan on February 12, 2015.  He had not been regularly using his CPAP machine, and his back status was unchanged.  Dr. Hanahan noted that range of motion was restricted at the extremes and his leg lifts were weak bilaterally.  (Tr. 995)

Proctor saw Rajnikant Manibhai Patel, M.D., on February 14, 2015 for a general surgery consultation related to the abscess on his neck which was spontaneously draining.  Dr. Patel recommended that Proctor continue to use a topical antibiotic.  (Tr. 507-509)

Proctor followed-up with Dr. Lee on February 16, 2015.  (Tr. 377)  Proctor reported that he had been thirsty for the past few weeks and was drinking a lot of Gatorade orange juice.  He was started on insulin and his blood sugar improved.  He was prescribed insulin for diabetes mellitus; referred to a neurologist for neuropathy; referred to general surgery for his neck abscess; advised on bariatric surgery; continued on his current medications for hypertension and hyperlipidemia; and referred to dermatology for a skin lesion.  (Tr. 379)

Proctor followed up with neurologist, Dr. Muthusamy, on February 16, 2015.  Proctor complained of back pain and lumbar spinal stenosis.  Proctor still experienced severe pain in his low back that spread to his legs when standing too long.  His pain was triggered by standing and he was never comfortable being in one position for a prolonged time.  His pain was associated with constant numbness over his left thigh.  (Tr. 369)  A cane had been prescribed but not obtained.  (Tr. 370)  Deep tendon reflexes were 1/4 in both upper and lower extremities.  His gait showed waddling.  (Tr. 372)

8

Proctor followed up with Dr. Lee on March 2, 2015 on his hypertension and diabetes conditions.  Dr. Lee diagnosed diabetes mellitus, hypertension, and migraines and prescribed insulin, Amlodipine, Clonidine, Metropropol Tartrate and Topiramate.  (Tr. 365-366)  On April 2, 2015, Proctor followed up with Dr. Lee again.  He told Dr. Lee that he was not interested in bariatric surgery at that time.  Dr. Lee diagnosed diabetes, hypertension, Vitamin D deficiency, morbid obesity and hyperlipidemia.  (Tr. 615)

Proctor saw Dr. Hanahan on March 12, 2015 and April 10, 2015.  He reported he still experienced back pain, and his condition was relatively unchanged.  (Tr. 993, 994)

On March 23, 2015, Proctor established care with Chenguttai Manohar, M.D.  Proctor said he had been doing well with his diabetes with stable numbness in his feet.  (Tr. 983) Physical examination showed dryness and a callus on the right foot.  He had diminished vibratory sensation and diminished position sense at toe level; diminished tactile sensation with monofilament testing throughout both feet; delayed capillary refill on the right and left.  He was considered high risk and was assigned risk category 2 due to loss of protective sensation without weakness, deformity, callus, pre-ulcer or history of ulceration.  (Tr. 986)

Proctor followed-up with Dr. Manohar on April 28, 2015 for high blood pressure, diabetes mellitus, congestive heart failure, high cholesterol, morbid obesity, diabetic neuropathy, and hypothyroidism.  (Tr. 978)  He weighed 492 pounds and his BMI was 63.17.  (Tr. 980)  He had numbness and tingling in his lower extremities, but the symptoms of his diabetic neuropathy were much under control on Gabapentin.  (Tr. 978, 981)  Dr. Manohar noted that he was going to give him a disability parking card due to his multiple medical problems.  (Tr. 981)

On April 29, 2015, Proctor underwent a physical therapy evaluation.  Proctor reported low back pain, numbness in both legs, and weakness in the left lower extremity.  He could

usually only walk 5-7 minutes before having pain in the low back and had very few positions of comfort.  He had a waddling gait and decreased hip flexion and swing bilaterally due to adipose distribution restricting hip movement.  The physical therapist opined that Proctor's low back dysfunction was aggravated by morbid obesity, which also put greater stress on his joints.  The physical therapist recommended a walking program and that Proctor consult a dietitian for weight loss.  He also ordered aquatic therapy to decrease the stress on his joints and to increase his ability to move.  (Tr. 1008-1012)

Proctor attended aquatic therapy on April 30, 2015.  He rated his low back pain as 8/10 and complained of left thigh numbness.  (Tr. 1007)  Proctor attended five more aquatic therapy sessions.  At his session on May 28, 2015, he reported increased pain and his activity tolerance was decreased.  (Tr. 1527)

Proctor saw Dr. Hanahan on May 12, 2015.  He reported that his back pain had improved with aquatic therapy.  He said that the pain improved for three to four hours after completing therapy, then returned.  He continued to have problems with ambulation and was using a cane. (Tr. 1489)

On June 11, 2015, Proctor reported to Dr. Hanahan that he had completed aquatic therapy and noted some improvement.  He continued to have difficulty sleeping at night.  Examination showed tenderness in the paralumbar muscles; range of motion was restricted; and leg lift was weak bilaterally.  (Tr. 1488)

On July 9, 2015, Proctor told Dr. Hanahan that he continued to have back pain despite pain medication.  (Tr. 1487)  On August 6, 2015, he told Dr. Hanahan that he was exercising at the YMCA two to three times per week and that his weight was going down gradually.  He

bought a new bed and was sleeping better.  His range of motion was still restricted and Dr. Hanahan noted that it was difficult for him to rise from a chair. (Tr. 1485)

Proctor followed-up with Dr. Hanahan on September 8, 2015.  He reported injuring his left ribs as he was riding a stationary bike.  He was having difficulty sleeping.  Range of motion remained restricted and his gait was antalgic favoring the right.  His leg lift was weak on the right.  (Tr. 1484)

On December 3, 2015, Proctor met with Dr. Manohar.  His diabetes control was good and the numbness in his feet was stable.  Dr. Manohar noted that Proctor was currently asymptomatic.  (Tr. 1495)  Dr. Manohar advised him to lose weight and that he would benefit from bariatric surgery.  (Tr. 1500)

Proctor started pain management with Dean C. Pahr, D.O., on December 22, 2015. Proctor had back pain for four years.  He was 6'2" and 488 pounds.  His blood pressure was 157/82 and he rated his pain as 10/10.  Dr. Pahr diagnosed a history of lumbar radiculitis and lumbar canal stenosis.  He requested a copy of Proctor's MRI to review but did not change any of Proctor's medications at this first appointment.  (Tr. 1723)

Proctor met with Dr. Pahr again on March 14, 2016.  Proctor reported that morphine had caused a rash on the back of his neck.  Proctor had been out of medication for over a month.  Dr. Pahr encouraged Proctor to continue exercising and to lose weight.  He prescribed a small dose of Oxycodone.  (Tr. 1721)  Proctor had another appointment with Dr. Pahr on June 1, 2016. Proctor reported that the Oxycodone helped but that he would prefer something stronger.  Dr. Pahr assessed lumbosacral radiculitis and chronic pain syndrome.  (Tr. 1720)

Proctor followed-up with Dr. Manohar on March 15, 2016.  His blood pressure was running very high because he had not been taking his blood pressure medications. (Tr. 1771)  Dr.

11

Manohar noted that Proctor had 5/5 strength in both his upper and lower extremities, bilaterally. (Tr. 1774)  However, his grandmother had died and he was feeling depressed and down.  His pain was not under control.  (Tr. 1771)

Proctor saw Dr. Pahr on August 23, 2016.  Proctor was doing well with his pain medications.  He had no new pains across his back.  His pain levels were moderate to severe and he rated them as 9/10.  Dr. Pahr continued Proctor's prescription of Oxycodone.  (Tr. 1753)

He met with Dr. Manohar again on October 6, 2016.   He had difficulty breathing with exertion and could not tolerate exercise.  He complained of tiredness and fatigue.  He weighed 491 pounds and his BMI was 66.  Dr. Manohar's notes state, "[d]ue to morbid obesity BMI 66, chronic low back pain spinal canal stenosis, diabetes mellitus with neuropathy, walking with the help of a cane, in my impression I do not think he is employable."  (Tr. 1732)

Proctor followed-up with Dr. Pahr on December 5, 2016.  Proctor did not have any new pains across his back or into his legs.  Proctor reported that he was going through a full workup with bariatric surgery through the Cleveland Clinic.  Dr. Pahr's diagnosis remained lumbosacral radiculitis and chronic pain syndrome.  Dr. Pahr continued Proctor's small dose of Oxycodone. (Tr. 1750)

> C.  **Opinion Evidence**

> 1.  **State Agency Reviewing Physicians**

On August 4, 2015, Abraham Mikalov, M.D., reviewed Proctor's records and opined that he could frequently lift 10 pounds and could occasionally lift 20 pounds; he could stand and/or walk for 2 hours; and could sit for 6 hours in an 8-hour workday.  (Tr. 111-112)  He could never climb ladders, ropes or scaffolds, but could occasionally climb ramps/stairs, balance, stoop, kneel, crouch and/or crawl.  (Tr. 112)  He opined that Proctor should avoid all exposure to

hazards such as machinery and heights.  Dr. Mikalov adopted the RFC from a prior ALJ decision of December 9, 2013.[2]  (Tr. 113)

On October 26, 2015, Rannie Amiri, M.D., reviewed Proctor's medical records and determined that there was new and material evidence.  For this reason, he did not adopt the December 2013 ALJ decision.  (Tr. 163)  Dr. Amiri opined that Proctor could frequently lift 10 pounds and could occasionally lift 20 pounds; he could stand and/or walk for 2 hours; and could sit for 6 hours in an 8-hour workday.  (Tr. 162)  He could never climb ladders, ropes or scaffold and he could never crawl, but he could occasionally climb ramps and stairs, balance, stoop, kneel and crouch.  (Tr. 162-163)   He opined that Proctor should avoid all exposure to hazards such as machinery and heights.  (Tr. 163)

### 2. Consultative Examination by Edward A. Carrillo, M.D., – July 2014

On July 21, 2014, Dr. Edward A. Carrillo examined Proctor at the request of the Ohio Department of Job and Family Services.[3]  (Tr. 335-339)  Proctor was 6'2" and weighed 460 pounds.  He complained of severe back and leg pain.  He told Dr. Carrillo he had been diagnosed with spinal stenosis in the lumbar spine, which was causing pain and paresthesias in both legs.  He also reported pain in the heels and that he was using a cane.  (Tr. 336)

Examination showed bilateral 2+ pitting edema in Proctor's lower extremities; epigastric tenderness; lumbar tenderness; an antalgic gait; use of a cane; and an inability to heel/toe walk.  (Tr. 337)  Dr. Carrillo observed positive straight leg raising at 60 degrees and 4/5 strength in the left shoulder and 4/5 left hip strength.  (Tr. 338-340)

---

[2] Proctor has not challenged the ALJ's *Drummond* analysis in this appeal.  Thus, the prior ALJ's decision is not summarized in this report.

[3] Dr. Carrillo performed a similar examination in October 2013.  (Tr. 341-345)

Dr. Carrillo opined that Proctor was extremely limited in his ability to stand, walk, sit, and bend and moderately limited in his ability to push/pull, and reach due to back problems and his obesity.  (Tr. 339)  He opined that he was unable to lift more than 10 pounds at a time and could occasionally lift or carry articles like docket files, ledgers, and small tools.  Dr. Carrillo opined that Proctor gave reasonable effort during the exam.  (Tr. 340)

### 3. Consultative Exam – Ardeshir Tamboli, M.D., - November 2016

Dr. Ardeshir Tamboli performed a consultative examination on November 5, 2016. Proctor weighed 500 pounds.  His blood pressure was 158/100.  (Tr. 1760)  Examination showed abnormal Rhomberg's test; 3+ pitting edema; decreased peripheral pulses bilaterally; lumbar tenderness and spasm; abnormal sensation to hands and feet; positive Tinel's sign at the wrist and ankles; positive Phalen's test at wrist; an inability to heel/toe walk; an antalgic gait; and use of a cane.  Proctor's deep tendon reflexes were 1+ throughout.  (Tr. 1762)  His range of motion was reduced to 20 degrees flexion and 5 degrees extension in the back and 20 degrees flexion in both hips.  Straight leg raise tests were positive bilaterally at 10 degrees.  (Tr. 1763)  Proctor's motor strength was 4/5 in his shoulders, knees, hips, ankles, and big toes.  Dr. Tamboli opined that Proctor's ability to stand, walk, push/pull, bend and reach were extremely limited.  (Tr. 1764)

### 4. Treating Physician – Paul C. Hanahan, M.D., - February 2015

On February 12, 2015, Dr. Paul Hanahan wrote a brief letter stating that Proctor was under his care for "chronic medical problems," and that he was "unable to sustain remunerative employment" at that time.  (Tr. 1003)

14

### 5.      Treating Physician – Dean C. Pahr, D.O., - March 2017

Dr. Pahr prepared a Medical Source Statement on March 3, 2017.  (Tr. 1778- 1780)  Dr. Pahr opined that Proctor had the ability to continuously stand or walk for 30 minutes at one time. He would then need to sit down for 30 minutes.  Dr. Pahr opined that Proctor could stand for a total cumulative of 2 hours a day.  (Tr. 1778)  Dr. Pahr opined that Proctor had the same limitations with his ability to sit: he could sit for a continuous 30 minutes at a time; would then need to walk around; and could sit for a total cumulative of 2 hours a day.  (Tr. 1778-1779)  Dr. Pahr opined that Proctor would require two hours of rest during the workday to relieve fatigue. His basis for this opinion was "daily pain."  (Tr. 1779)  Dr. Pahr opined that Proctor could lift 1-10 pounds occasionally and 11-50 pounds rarely or not at all; could frequently balance; and could occasionally stoop.  These opinions were based on Dr. Pahr's diagnosis of lumbosacral radiculitis.  Dr. Pahr opined that Proctor would be absent from work about three times a month due to his impairments or treatment.  (Tr. 1780)

Dr. Pahr also completed an Off-Task/ Absenteeism Questionnaire.  (Tr. 1781)  In this questionnaire, Dr. Pahr opined that Proctor would likely be off-task due to back pain at least 20 percent of the time, exclusive of ½ hour lunch and two fifteen minute breaks.  He stated again that he thought Proctor would be absent from work about three times a month.  (Tr. 1781)

### D.      Relevant Testimonial Evidence

Proctor testified at the hearing.  (Tr. 46-68)  Proctor is 6'2" tall.  At the time of the hearing, he weighed 518 pounds.  He lived in a house with a roommate.  His bedroom was on the second floor.  (Tr. 47-48)  Proctor had a driver's license and was able to drive.  (Tr. 48)  He had prior work experience as a telemarketer, a stock selector, and a production machine operator. (Tr. 51)

Proctor stated that his health had worsened since his last administrative hearing.  He was more overweight.  He now had neuropathy and diabetes.  Diabetes caused his feet to swell and he also had shortness of breath.  His back pain was worse.  (Tr. 53-54)  He was diagnosed with obstructive sleep apnea.  (Tr. 56)  He was using a cane.  (Tr. 67)

Proctor did very little around his house.  His son went to the grocery store for him, cleaned his house, did yard work, prepared his meals and paid his bills.  (Tr. 59)

Proctor felt he was unable to work because he could not remain in the same position for long periods of time.  He experienced numbness in his leg and tingling in his feet.  (Tr. 60-62)  He was also forgetful and had difficulties dealing with other people.  (Tr. 61)

Brett Sulkin, a vocational expert, also testified at the hearing.  (Tr. 68-75)  Relevant to Proctor's arguments, the VE testified that there would be a significant number of jobs that an individual with Proctor's residual functional capacity could perform if he could perform them at production rate pace.  (Tr. 71-72)  However, if Proctor needed to leave his work station 15% of the time, he would not be able to maintain full-time employment.  (Tr. 73)  If he needed to elevate his legs at work he would be able to maintain employment but not if he needed to elevate his legs more than 90 degrees.  (Tr. 75)

## IV.  The ALJ's Decision

The ALJ's decision of March 27, 2017 set forth the following findings relevant to this appeal:

3.  Proctor had the following severe impairments:  degenerative disc disease; hypertension; congestive heart failure; diabetes mellitus with neuropathy; obstructive sleep apnea; thyroid disease; depression; obesity; dysfunction of the major joints; and borderline intellectual functioning.  (Tr. 14)

4.  He did not have an impairment or combination of impairments that met or medically equaled the severity of any of the listed impairments.  (Tr. 14)

16

5. Proctor had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except he could push and pull as much as he could lift and carry.  He could operate foot controls with the left foot occasionally.  He could climb ramps and stairs occasionally.  He could never climb ladders, ropes, or scaffolds.  He could occasionally balance, stoop, kneel and crouch.  He could never crawl.  He could never work at unprotected heights, around moving mechanical parts and cannot perform commercial driving.  He could perform simple, routine tasks.  He could occasionally interact with coworkers, supervisors and the public.  He could handle routine workplace changes.  He needed to use a cane for ambulation. (Tr. 19)

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there existed a significant number of jobs that he could perform.  (Tr. 29)

Based on his total findings, the ALJ determined Proctor had not been under a disability from August 25, 2014 through the date his application was filed.  (Tr. 30)

## V.    Law & Analysis

### A.    Standard of Review

This court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.,* 348 F.3d 124, 125 (6th Cir. 2003); *Kinsella v. Schweiker,* 708 F.2d 1058, 1059 (6th Cir. 1983).  Substantial evidence has been defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.,* 25 F.3d 284, 286 (6th Cir. 1994).

The Act provides that "the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. §§ 405(g) and 1383(c)(3). A court cannot reverse the Commissioner's findings just because the record contains substantial

evidence to support a different conclusion. *Buxton v. Halter,* 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen v. Bowen,* 800 F.2d 535,545 (6th Cir. 1986); *see also Her v. Comm'r of Soc. Sec.,* 203 F.3d 288, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached." *See Key v. Callahan,* 109 F.3d 270, 273 (6th Cir. 1997). This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without risking being second-guessed by a court. *Mullen,* 800 F.2d at 545 (*citing Baker v. Heckler,* 730 F.2d 1147, 1150 (8th Cir. 1984).

The court also must determine whether the ALJ decided the case using the correct legal standards. If not, reversal is required unless the legal error was harmless. *See e.g. White v. Comm'r of Soc. Sec.* 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [when] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue,* 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996); *accord Shrader v. Astrue,* No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue,* No. 1:10-cv-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue,* No. 2:10-CV-017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-19822010, 2010 U.S.

Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).  Requiring an accurate and logical bridge ensures that a claimant will understand the ALJ's reasoning.

In considering an application for supplemental security income or for disability benefits, the Social Security Administration must follow a five step sequential analysis: at Step One, the Commissioner asks if the claimant is still performing substantial gainful activity; at Step Two, the Commissioner determines if one or more of the claimant's impairments are "severe;" at Step Three, the Commissioner analyzes whether the claimant's impairments, singly or in combination, meet or equal a listing in the Listing of Impairments; at Step Four, the Commissioner determines whether the claimant can still perform his past relevant work; and finally, at Step Five, if it is established that claimant can no longer perform her past relevant work, the burden of proof shifts to the agency to determine whether a significant number of other jobs which the claimant can perform exist in the national economy.  *See Combs v. Comm'r of Soc. Sec.,* 459 F.3d 640, 643 (6th Cir. 2006); 20 C.F.R. §§404.1520, 416.920.  A plaintiff bears the ultimate burden to prove by sufficient evidence that he is entitled to disability benefits.  20 C.F.R. §404.1512(a).

### B.     Treating Physician Rule[4]

Proctor contends that the ALJ erred in assigning little weight to the opinion of his treating physician, Dr. Pahr and also for failing to state good reasons for the weight he assigned.  The administrative regulations implementing the Social Security Act impose standards for weighing medical source evidence.  *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011).  In making disability determinations, an ALJ must evaluate the opinions of medical sources in accordance with the nature of the work performed by the source.  *Gayheart v. Comm'r of Soc. Sec.,* 710 F.3d 365, 375 (6th Cir. 2013).  The treating physician rule requires that "[a]n ALJ [] give the opinion

---

[4] 20 CFR §§ 416.927 applies to Proctor's claim because it was filed before March 27, 2017.

of a treating source controlling weight if he finds the opinion well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in [the] case record."  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(c)(2)) (internal quotation marks omitted).

Even if the ALJ does not give the opinion controlling weight, the treating source opinion is still entitled to significant deference or weight that takes into account the length of the treatment and frequency of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and whether the treating physician is a specialist.  20 C.F.R. § 416.927(c)(2)-(6).  The ALJ is not required to explain how he considered each of these factors but must provide "good reasons" for discounting a treating physician's opinion.  20 C.F.R. § 416.927(c)(2); see also *Cole*, 661 F.3d at 938.  ("In addition to balancing the factors to determine what weight to give a treating source opinion denied controlling weight, the agency specifically requires the ALJ to give good reasons for the weight actually assigned.")

The ALJ's "good reasons" must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Gayheart*, 710 F.3d at 376 (quoting Soc. Sec. Rul. No. 96-2p, 1996 SSR LEXIS 9, *12, 1996 WL 374188, at *5 (Soc. Sec. Admin. July 2, 1996)).  As the Sixth Circuit has noted,

> [t]he conflicting substantial evidence must consist of more than the medical opinions of the nontreating and nonexamining doctors.  Otherwise the treating physician rule would have no practical force because the treating source's opinion would have controlling weight only when the other sources agreed with that opinion.  Such a rule would turn on its head the regulation's presumption of giving greater weight to the treating sources because the weight of such sources would hinge on their consistency with nontreating, nonexamining sources.

*Id.* at 377.

20

A failure to follow these procedural requirements "denotes a lack of substantial evidence, even [when] the conclusion of the ALJ may be justified based on the record." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 243 (6th Cir. 2007).  The Sixth Circuit Court of Appeals "do[es] not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion and [it] will continue remanding when [it] encounter[s] opinions from ALJs that do not comprehensively set forth reasons for the weight assigned." *Cole*, 661 F.3d at 939 (quoting *Hensley v. Astrue*, 573 F.3d 263, 267 (6th Cir. 2009)) (alteration in original) (internal quotation marks omitted).

Regarding Dr. Pahr's opinion of Proctor's physical capacity, the ALJ stated:

> In this case, upon consideration of the evidence, I find Dr. Pahr's opinion is somewhat supported and consistent with the record as a whole.  I gave partial weight to this opinion to the extent that it was consistent with the above residual functional capacity findings.  Specifically, on exam, he had 5/5 motor strength in all extremities (Ex. B28F/7).  His sensation was intact.  He was able to do rapid alternating movements.

(Tr. 28)  The ALJ's reasons for assigning partial weight to Dr. Pahr's opinion was that it was not entirely consistent with the ALJ's RFC finding and that one of the medical records showed that Proctor had 5/5 motor strength in all his extremities, intact sensation and that he was able to do rapid alternating movements.  (Tr. 28)

The ALJ may assign less than controlling weight to the treating physician's opinion if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques and if it is inconsistent with the other substantial evidence in [the] case record.  If the ALJ makes these findings, he must still take into account the length and frequency of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and whether the treating physician is a specialist.  Here, the ALJ's opinion does not reveal whether the ALJ considered these factors.  He cited a single, isolated medical record

documenting Proctor's complaint of "painful toenails." (Tr. 1707-1709)  The cited record does not even contain the information referred to by the ALJ.

However, the evidence *does* reflect other occasions when Proctor's physicians noted 5/5 strength and intact sensation.  (Tr. 1774)  It is likely that the ALJ intended to cite Record B38F/7 rather than B28F/7.  Even so, this one record does not completely reflect Proctor's overall functional limitations.  For example, Dr. Manohar's March 2016 office note indicates that Proctor had 5/5 muscle strength.  But Dr. Tamboli's November 2016 physical examination showed many areas of decreased strength.  (Tr. 1764)  The evidence does not show that Proctor had 5/5 muscle strength consistently.

Moreover, even if the record did show that Proctor consistently displayed 5/5 muscle strength, that would not necessarily contradict many of Dr. Pahr's opinions.  Dr. Pahr opined that Proctor's functional abilities were limited by his "daily pain."  (Tr. 1779)  The fact that Dr. Manohar noted 5/5 strength at an appointment did not mean that Proctor was not experiencing pain and/or that his pain did not impact his functional abilities.  In fact, on October 6, 2016, Dr. Manohar wrote that he did not think that Proctor was employable due to his conditions, including his back pain.  (Tr. 1732)

One of the ALJ's reasons for assigning little weight to Dr. Pahr was that his opinion did not match the ALJ's RFC findings.  However, it was the ALJ who was required to consider Dr. Pahr's opinion when making his RFC findings, not the other way around.  It is not possible to tell from the ALJ's decision whether he took into account the length of the treatment relationship, the supportability or the consistency of his opinion with the record as a whole or whether Dr. Pahr was a specialist.  He cited no evidence in the record that directly contradicted Dr. Pahr's opinions or that indicated his opinion was not based on acceptable clinical and laboratory

techniques.  Thus, the ALJ failed to point to "evidence in the case record . . . sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."  *Gayheart*, 710 F.3d at 376 (quoting Soc. Sec. Rul. No. 96-2p, 1996 SSR LEXIS 9, *12, 1996 WL 374188, at *5 (Soc. Sec. Admin. July 2, 1996)).

The Commissioner argues that substantial evidence supported the ALJ's RFC determination and that he made factual findings elsewhere in his opinion which supported the decision to reject Dr. Pahr's opinion.  ECF Doc. 14, Page ID# 1882-1886.  Much of the Commissioner's brief is dedicated to arguing that the ALJ properly analyzed other medical opinions and record evidence.  ECF Doc. 14 at Page ID# 1888-1892.  The Commissioner points to some of this evidence and argues that the ALJ properly rejected Dr. Pahr's opinion.  ECF Doc. 14, Page ID# 1886-1887.  The Commissioner also argues that the ALJ accounted for Proctor's sensation and back limitations in his RFC.  Id.  These assertions miss the point of Proctor's argument: that the ALJ failed to explain exactly why he rejected Dr. Pahr's views.  Moreover, the ALJ did not cite this evidence or provide a good reason for rejecting Dr. Pahr's opinion in his decision.  Thus, even if the Commissioner's argument tracks what went through the mind of the ALJ, it is merely "post-hoc gloss on the ALJ's decision" because it is not what the ALJ actually said.  *See Camacho v. Comm'r Soc. Sec.,* No. 1:17-cv-222, 2017 U.S. Dist. LEXIS, 205873 (Dec. 5, 2017).  Such post-hoc argument is unavailing.

In some circumstances, an ALJ's failure to articulate "good reasons" for rejecting a treating physician opinion is harmless error.  These circumstances arise when (1) "a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it," (2) "the Commissioner adopts the opinion of the treating source or makes findings consistent with

the opinion," or (3) "the Commissioner has met the goal of § 1527(d) – the provision of the procedural safeguard of reasons – even though she has not complied with the terms of the regulation.  "*Wilson,* 378 F.3d at 547.  *See also Cole,* 661 F.3d at 940.  In the last of these circumstances, the procedural protections at the heart of the rule may be met when the "supportability" of the doctor's opinion, or its consistency with other evidence in the record, is indirectly attacked via an ALJ's analysis of a physician's other opinions or his analysis of the claimant's ailments.  *See Nelson v. Comm'r of Soc. Sec.,* 195 Fed. App'x 462, 470-471 (6th Cir. 2006); *Hall v. Comm'r of Soc. Sec.,* 148 Fed. App'x 456, 464 (6th Cir. 2005); *Friend v. Comm'r of Soc. Sec.*, 375 Fed. App'x 543, 551 (6th Cir. 2010).  "If the ALJ's opinion permits the claimant and a reviewing court a clear understanding of the reasons for the weight given a treating physician's opinion, strict compliance with the rule may sometimes be excused."  *Friend,* 375 Fed. App'x at 551.

Here, the ALJ's citation to a single medical record with very little analysis did not provide an understanding of the reasons for the weight he assigned to Dr. Pahr's opinion.  The single record cited by the ALJ was incorrectly identified and did not necessarily contradict many of Dr. Pahr's opinions.  Otherwise, the ALJ rejected the opinion because it didn't correlate with his own RFC findings.  This gives the impression that the ALJ simply substituted his own opinion for that of the treating physician.  The court cannot determine whether the ALJ fully considered the elements contemplated by 20 C.F.R. § 416.927(c)(2)-(6) including whether the medical evidence in the record as a whole supported Dr. Pahr's opinions.  The ALJ's failure to provide sufficiently specific "good reasons" for rejecting Dr. Pahr's opinion regarding Proctor's limitations was not harmless error.  Even if good reasons existed to reject the treating physician's

opinion, the ALJ failed to sufficiently articulate those reasons to allow for meaningful review.  I recommend that the Court remand the ALJ's decision for further proceedings.

### C.       Listing 1.04(B)

Proctor also contends that the ALJ erred in finding that the evidence did not meet Listing 1.04(B).  Proctor cites evidence in the record arguing that he met each of the requirements of the Listing.  Listing 1.04 governs disorders of the spine and requires that the spinal condition result "in compromise of a nerve root . . . or the spinal cord."  20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.04.  Additionally, there must be:

> B.  Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours;

*Id*.  Thus, to satisfy Listing 1.04(B), Proctor was required to demonstrate compromise of a nerve root or spinal cord and: (1) spinal arachnoiditis confirmed by acceptable imaging; and (2) a manifestation of severe burning or painful dysesthesia resulting in the need for changes in position or posture more than once every 2 hours.  In addition, the regulations require that the abnormal findings must be established over a period of time: "[b]ecause abnormal physical findings may be intermittent, their presence over a period of time must be established by a record of ongoing management and evaluation."  20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.00(D).

The ALJ discussed Listing 1.04(A) but did not mention Listing 1.04(B).  (Tr. 14-15)  He found that 1.04(A) was not met because the record did not establish "evidence of a compromise of a nerve root and evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motor of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and positive straight-leg raising test (sitting and supine)."  (Tr. 14-15)  He further explained his finding as follows:

MRI of the claimant's lumbar spine dated January 30, 2014 showed epidural lipomatosis, which completely effaced the cerebral spinal fluid from the thecal sac at multiple vertebral body levels (Ex. B1F/4).  There was possible arachnoiditis with peripheral location of nerve roots and some clumping as demonstrated as L5-S1, one of the few levels where CSF is actually demonstrated within the thecal sac.  There were multilevel discogenic and facet hypertrophic degenerative changes superimposed upon a congenitally narrow canal.  There was moderate to severe lateral recess stenosis at L5-S1 related to a disc herniation.  (Ex. B1F/5).  There was a disc herniation at L3-L4 along with the prominent posterior epidural fat, which severely compresses the thecal sac with moderate canal stenosis.  On exam, he had 5/5 strength in all muscle groups and a normal sensory examination.  (Ex. B2F/4)  His gait was normal.

(Tr. 15)  It appears that the ALJ merely listed the impressions from the January MRI in his decision, with no analysis.  (Tr. 320-321)

Proctor's brief cites the following evidence in support of a finding that he met Listing 1.04(B):

Mr. Proctor contends he met his burden of proving his degenerative disc disease met the requirements of Listing 1.04B.  Mr. Proctor was diagnosed with degenerative disc disease, spinal stenosis, and arachnoiditis by magnetic resonance imagining ("MRI") on January 30, 2014 (Tr. 318-320).  These conditions result in a compromise of the nerve root.  Specifically, Mr. Proctor has moderate lateral recess stenosis at L2-3, severe thecal sac compression at L3-4, moderate lateral recess stenosis at L4-5, and moderate to severe right lateral recess stenosis at L5-S1 with nerve root clumping at the periphery of the thecal sac suggestive of arachnoiditis.  *Id.*  Per the introductory language of the listings, medically acceptable imaging, as is required by Listing 1.04(B), includes MRI.  20 C.F.R. Part 404, Subpart P, Appendix 1, at 1.00C1.

Mr. Proctor has complained of painful dysesthesia in his lower extremities throughout the relevant time period.  (*E.g.,* TR 323-27, 335-39, 369, 397, 402, 407, 413, 417, 423, 438, 443, 448, 509, 747-48, 807, 978-82, 993-1002, 1008-12, 1484-89, 1554-59, 1712-23, 1727, 1750-53, 1760).

Finally, Mr. Proctor's treating physician has opined that his pain and discomfort requires the need to change position or posture more than once every 2 hours.  Dr. Pahr opined Mr. Proctor could stand a maximum of 30 minutes at one time before having to sit for 30 minutes, and stand a total of two hours total during an eight-hour workday; could sit a maximum of 30 minutes at one time before having to walk about for 30 minutes, and sit a total of two hours total during an eight-hour workday.  Dr. Pahr said Proctor would need to lie down or recline in an easy chair

to relief fatigue and daily pain for two hours total during an eight-hour workday. (Tr. 1778-80).

ECF Doc. 13 at Page ID# 1851-1852.

The Commissioner argues that Proctor did not meet his burden of showing that he met Listing 1.04(B). The Commissioner cites the ALJ's decision stating that Proctor had "possible" arachnoiditis. Because the MRI showed only "possible" arachnoiditis, the Commissioner contends that the ALJ's decision rejects Listing 1.04(B). ECF Doc. 14 at Page ID# 1877. The Commissioner cites numerous medical records supporting a decision that Proctor did not meet Listing 1.04(B). ECF Doc. 14 at Page ID# 1879-1880. The problem with the Commissioner's argument is that the ALJ's decision never discussed this evidence or even mentioned the requirements for Listing 1.04(B).

In *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411 (6th Cir. 2011), the ALJ determined that the claimant did not have an impairment that met or equaled any of the impairments listed in Section 1.00 of the Listings without actually evaluating the evidence and giving an explanation for his conclusion. The Sixth Circuit determined that, without a reasoned explanation, the ALJ's decision precluded meaningful judicial review and was not supported by substantial evidence. *Id.* at 416. After *Reynolds*, the Sixth Circuit has expressly declined to adopt a blanket rule that remand is required whenever an ALJ provides minimal reasoning at Step Three of the sequential evaluation process. *See Forrest v. Comm'r of Soc. Sec.,* 591 F. App'x 359 (6th Cir. 2014). In *Forrest*, the ALJ found at Step Three only that the plaintiff's impairments did not meet or medically equal the severity of a listed impairment. *Id.* Despite his "sparse analysis," the Sixth Circuit affirmed the ALJ's Listings finding because he "made sufficient factual findings elsewhere in his decision to support his conclusion at [S]tep [T]hree." *Id.* at 366 (citing *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006) (looking to findings

27

elsewhere in the ALJ's decision to affirm a Step Three medical equivalency determination, and finding no need to require the ALJ to "spell out every fact a second time'); *Burbridge v. Comm'r of Soc. Sec*., 572 F. App'x 412, 417 (6th Cir. 2014) (Moore, J., dissenting) (acknowledging that an ALJ's Step Three analysis was "cursory" but suggesting that, under Sixth Circuit precedent, it is enough for the ALJ to support his findings by citing an exhibit when the exhibit contained substantial evidence to support his conclusion) (emphasis in original)).

The Sixth Circuit has also ruled that even if the ALJ's Step Three finding lacked adequate support, the error was harmless because the plaintiff had not shown that his impairments met or medically equaled in severity any listed impairment.  *Id*., citing *Reynolds*, 424 F. App'x at 416 (ALJ erred by providing no reasons to support his finding that a specific listing was not met, and error was not harmless because claimant had possibly put forward sufficient evidence to meet the Listing); *Audler v. Astrue*, 501 F.3d 446, 448-49 (5th Cir. 2007) (lack of Step Three explanation was not harmless when claimant carried her burden of showing she met a listing)).  *See also Joyce v. Comm'r of Soc. Sec*., 662 F. App'x 430, 435 (6th Cir. 2016) (harmless error found when ALJ's rejection of listing-level IQ score as inconsistent with record evidence was supported, which necessarily precluded finding that plaintiff met requirements of Listing 12.05(C)); *Crum v. Comm'r of Soc. Sec*., 660 F. App'x 449, 455 (6th Cir. 2016) (record evidence sufficient to support ALJ's conclusion that the plaintiff did not meet requirements of Listing 12.05(C)).

Here, the ALJ should have explained why Proctor did not meet Listing 1.04(B).  Proctor cites evidence arguably showing that his impairments met Listing 1.04(B).  The ALJ's decision did not mention this subsection of Listing 1.04 or discuss its criteria.  As argued by the Commissioner, there may very well be substantial evidence supporting a finding that Proctor's

28

impairments did not meet Listing 1.04(B). But, without a reasoned explanation, the ALJ's decision precludes meaningful judicial review on this issue. I recommend that the ALJ's decision be remanded for further proceedings consistent with this report and recommendation.

## VI.    Recommendation

Because the ALJ failed to apply the correct legal standards, I recommend that the final decision of the Commissioner be vacated and that this case be remanded for further proceedings consistent with this report and recommendation.

Dated: September 25, 2018

Thomas M. Parker
United States Magistrate Judge

---

### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document. Failure to file objections within the specified time may waive the right to appeal the District Court's order. See *U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981). See also *Thomas v. Arn*, 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).